## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL NO. 2008-016 |
| v. ) | |
| ) | |
| DOMINIC WILLIAM, ) | |
| EUSTACE HARRY aka "Eustus Harry," ) | |
| VIBERT GEORGE aka "Eddy," ) | |
| CORNELIAN JOSEPH, ) | |
| ALDRICK PAUL, ) | |
| VIBERT GEORGE aka "T-bird," ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### MEMORANDUM OPINION

FINCH, J.

THIS MATTER comes before the Court on Motions to Suppress filed by Defendants. Defendants seek to suppress all evidence, including undersized lobsters and a sea turtle, recovered in connection with their stop and arrest on May 22, 2008. The United States of America opposes Defendants' motion. An evidentiary hearing was held on October 6, 2008 and continued on October 8, 2008.

   **I. FACTUAL FINDINGS**

Defendants are charged with **(1)** unlawfully taking an endangered species, that is, a hawksbill turtle, within the United States in violation of 16 U.S.C. §§ 1538(a)(1)(B), 1540(b)(1) and 18 U.S.C. § 2, **(2)** unlawfully possessing, carrying and transporting an endangered species taken within the United States, to wit, one hawksbill turtle, in violation of 16 U.S.C. §§

1

1538(a)(1)(D), 1540(b)(1) and 18 U.S.C. § 2, **(3)** unlawfully taking and possessing egg-bearing lobsters in violation of 12 V.I.C. § 319(d) and 14 V.I.C. § 11, and **(4)** unlawfully spearing lobsters in the process of their capture in violation of 12 V.I.C. § 319 (f) and 14 V.I.C. § 11.

On May 22, 2008 at approximately 9:18 p.m., central dispatch of the Virgin Islands Police Department received an anonymous call from a woman who reported seeing a small boat dropping off what appeared to be illegal aliens at Robin Bay on the southeast end of St. Croix. Central dispatch advised all units of the report of illegal alien entry in the South Shore area. While K-9 Officer Heraldo Charles was traveling on the Southside Road, which leads to Robin Bay, he encountered a red Toyota Tacoma pick-up truck traveling in the opposite direction. He remembered that a red pick-up truck was previously stopped for suspicion of transporting illegal aliens. Officer Charles observed four shirtless passengers in the truck bed, all with towels around their shoulders. When Officer Charles saw the truck, he called for assistance and stopped the truck based on his suspicion that the occupants were illegal aliens. At that time, Lieutenant Benjamin Rios and Sergeant Freddy Ortiz traveled on Southside Road to assist Officer Charles.

Officer Charles stopped the pick-up truck in the Longford area and interrogated the driver and the front passenger. The driver of the truck provided Officer Charles with a valid Virgin Islands drivers license and explained that he and his passengers had been fishing. When Lieutenant Rios and Sergeant Ortiz arrived in the Longford area, they saw Officer Charles speaking with the driver of the red Toyota Tacoma pick-up truck. Lieutenant Rios walked over to the truck and Officer Charles told him that "it was ok" because "they were locals that just came from fishing." With Lieutenant Rios' permission, Officer Charles left to continue searching for illegal aliens in the Robin Bay area and Lieutenant Rios stayed with the truck. Virgin Islands Police Officer

Daniel Rodriguez, who worked in the Immigration and Customs Enforcement task force, arrived on the scene after Officer Charles had left.

Lieutenant Rios asked no further questions about the occupants' immigration status. Instead of letting the individuals go, Lieutenant Rios asked the occupants what they had caught fishing. The occupants pointed to a green mesh bag that was in the truck bed. Lieutenant Rios looked at the bag and saw some fish and undersized baby lobsters. He then took the bag out of the truck and emptied the contents on the ground. Lieutenant Rios contacted central dispatch to call Officer Howard Forbes of the Department of Planning and Natural Resources to meet them at the scene.

While awaiting Officer Forbes arrival, Lieutenant Rios asked the detainees if they caught anything else and they showed him an adult-sized lobster. At that time, he noticed that one of the individuals sitting in the truck bed was acting very nervous and appeared to be trying to conceal something with his legs. Lieutenant Rios looked to the rear of the truck and saw something covered with t-shirts and asked what it was. The individuals looked at one another, but did not answer. Lieutenant Rios then reached into the truck bed and removed one of the t-shirts, revealing a dead sea turtle under the clothing. The turtle was lying on its shell with blood on its abdominal area and head, with a string around its neck. Defendants were arrested and the vehicle was seized. The vehicle was secured overnight and released to the owner the following day.

## II. STANDARD OF REVIEW

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const., amend. IV. 2 "What is reasonable depends upon all of the circumstances

3

surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). There is a presumptive requirement that searches or seizures be carried out pursuant to a warrant. See Katz v. United States, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."). Evidence obtained during the course of an unreasonable search and seizure can be suppressed and not admitted at trial. See Wong Sun v. United States, 371 U.S. 471, 485-86 (1963) (exclusionary rule requires suppression of any evidence which is either the direct or indirect product of illegal police conduct).

In some instances, warrantless searches or seizures will be considered reasonable if based on probable cause. See Hill v. California, 401 U.S. 797, 804 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment"). For example, police officers may lawfully arrest a suspect without a warrant if the officer has probable cause to believe the suspect has committed a felony and the arrest does not occur in the suspect's home. See Maryland v. Pringle, 540 U.S. 366, 373-74 (2003) (upholding warrant-less arrest where police had probable cause to believe defendant had committed a felony after they found cocaine within his reach); Michigan v. Royer, 452 U.S. 692, 700 (1981) (Every arrest is unreasonable unless supported by probable cause).

Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested. Draper v. United States, 358 U.S. 307, 313 (1999); United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002); United States v. Laville, 480 F.3d 187, 194 (3d Cir. 2007). While "probable cause to

4

arrest requires more than mere suspicion…it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt." Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

Even in the absence of probable cause, an officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). Accordingly, an officer may stop a moving vehicle to investigate a reasonable and articulable suspicion that its occupants are involved in criminal activity. United States v. Cuevas-Reyes, 2008 U.S. Dist. LEXIS 14523 at *6-7 (D.V.I. 2008) (citing Ornelas v. United States, 517 U.S. 690, 693 (1996) and United States v. Hensley, 469 U.S. 221, 226-27 (1985)).

Reasonable suspicion has been described as "a particularized and objective basis for suspecting the person stopped of criminal activity." Cuevas-Reyes, 2008 U.S. Dist. LEXIS 14523 at *7 (citing Ornelas, 517 U.S. at 695). The totality of the circumstances of each case are considered by the courts to determine whether reasonable suspicion exists. United States v. Arvizu, 534 U.S. 266, 273-74 (2002). Police officers may use their own experience and training "to make inferences . . . and deductions about the cumulative information available to them that might well elude an untrained person." Cuevas-Reyes, 2008 U.S. Dist. LEXIS 14523 at *7 (quoting Arvizu, 534 U.S. at 273-74). However, reasonable suspicion may not be based on an officer's hunch alone. Cuevas-Reyes, 2008 U.S. Dist. LEXIS 14523 at *7. The likelihood of criminal activity required for reasonable suspicion need not rise to the level required for probable cause. Id.; Arvizu, 534 U.S. at 273-74.

Reasonable suspicion and probable cause are determined with reference to the facts and circumstances within the officer's knowledge at the time of the investigative stop or arrest. Devenpeck v. Alford, 543 U.S. 146, 152 (2004); Florida v. J.L., 529 U.S. 266, 271 (2000); Laville, 480 F.3d. at 194. The validity of an investigative stop or arrest does not depend on whether the suspect actually committed a crime. See Arvizu, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."); Gerstein v. Pugh, 420 U.S. 103, 119-123 (1975) (mere fact that suspect is later acquitted of offense for which he is arrested is irrelevant to the validity of arrest). The appropriate inquiry, rather, is whether the facts and circumstances within the officer's knowledge at the time of an investigative stop or arrest objectively justify that action. Devenpeck, 543 U.S. at 153; see also Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). In considering whether probable cause exists, courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." Pringle, 540 U.S. at 371.

" In determining whether an arrest is reasonable under the Fourth Amendment, courts must never lose sight of the fundamental principle that 'reasonable suspicion and probable cause…are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Laville, 480 F.3d. at 196 (quoting Ornelas, 517 U.S. at 695 and Illinois v. Gates, 462 U.S. 213, 231 (1983)). The Third Circuit has held that district courts "must apply a common sense approach, based on the totality of the circumstances to determine whether there was probable cause to arrest." Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000); see also Sharrar v.

6

Felsing, 128 F.3d 810, 818 (3d Cir. 1997) (stating that courts must "use a 'common sense' approach to the issue of probable cause").

### III. DISCUSSION

Defendants contend that the stop of the red Toyota Tacoma pick-up truck on May 22, 2008, their extended detention and their subsequent arrest, occurred in violation of their rights under the Fourth Amendment. Defendants submit that the stop, detention, and search were without reasonable suspicion or any other legal justification. Defendants argue that any evidence obtained must be suppressed as the fruit of the poisonous tree. The Court must determine (1) whether there was reasonable suspicion to justify Officer Charles' initial stop of the vehicle, (2) whether Lieutenant Rios had reasonable suspicion to continue the detention of the occupants after Charles left the scene and, if so, (3) whether Lieutenant Rios had probable cause to search the pick-up truck.

### A. Initial Stop of Vehicle.

Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." Alabama v. White, 496 U.S. 325, 329 (1990); see Adams v. Williams, 407 U.S. 143, 146-147 (1972); Florida v. J.L., 529 U.S. 266, 270 (2000). There are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." White, 496 U.S. at 327, 332. The mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a brief investigatory stop of a person without meeting the

7

reliability requirement. See Terry, 392 U.S. at 27; Laville, 480 F.3d. at 195; see also United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006) ("[A] police officer does have the initial burden of providing the 'specific, articulable facts' to justify a reasonable suspicion") (citations omitted); J.L., 529 U.S. at 273 (holding that reasonable suspicion requires that a tip be reliable in its assertion of illegality).

Certain factors can bolster what would otherwise be an insufficient tip, such as "the presence of a suspect in a high crime area," "[a] suspect's presence on a street at a late hour," "[a] suspect's nervous, evasive behavior, or flight from police," and a suspect's behavior "that conforms to police officers' specialized knowledge of criminal activity." Brown, 448 F.3d at 251; see Torres, 534 F.3d at 211. Ultimately, the Court must ask whether the unknown caller's tip "possessed sufficient indicia of reliability, when considering the totality of the circumstances…to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a Terry stop." Brown, 448 F.3d at 250; see Torres, 534 F.3d at 211; United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002); see also Gates, 462 U.S. at 233 ("a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability"); United States v. Perkins, 363 F.3d 317, 325 (4th Cir. 2004) (holding that tip need not bear any particular indicia of reliability to supply reasonable suspicion where an officer had objective reason to believe that tip was reliable).

The tipster in this case was an eyewitness who had recently witnessed the alleged criminal activity and she had no apparent reason to lie to the police. See Brown, 448 F.3d at 249-50; see also United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (fact that "officers in our case knew that the informant was reporting what he had observed moments ago, not what

8

he learned from stale or second-hand sources" weighed in favor of tip's reliability).  Additional information also helped to bolster the tip.  Robin Bay on the south shore of St. Croix is in the general area where illegal aliens have entered the island in the past; a fact known to police officers and residents alike.  Additionally, Officer Charles saw the pick-up truck with several individuals in towels driving in the South Shore area at night.  See Brown, 448 F.3d at 251.

Although it is a very close case, considering the facts together with all reasonable inferences, the Court finds that, at the time Officer Charles approached Defendants on Southside Road, he had reasonable suspicion to believe that criminal activity was taking place.  See Terry, 392 U.S. at 27; Laville, 480 F.3d. at 195; see also Arvizu, 534 U.S. at 273-74 (holding that police officers may use their own experience and training "to make inferences . . . and deductions about the cumulative information available to them that might well elude an untrained person").  The Court finds that the tip, the officer's specialized knowledge of Robin Bay, and his observation of the red truck provided him with the requisite reasonable suspicion to justify a Terry stop.  See White, 496 U.S. at 327.

### B.   Rios' Detention of Defendants

An investigative detention based on reasonable suspicion must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Terry, 392 U.S. at 30; see also Florida v. Royer, 460 U.S. 491, 500 (1983) (holding that "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").  It is the government's burden to demonstrate that the seizure it seeks

to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.  Id. at 500.

Prior to Lieutenant Rios' arrival at the scene of the Terry stop, Officer Charles questioned the individuals in the front of the pick-up truck.  The purpose of Officer Charles' investigatory stop was to determine whether the passengers of the truck had made an illegal entry.  The driver produced a Virgin Islands driver's license and registration for the car, informing Officer Charles that the individuals in the vehicle had just gone fishing.  At this point, Officer Charles no longer suspected that the occupants were illegal aliens, which is evidenced by his subsequent statements made to Lieutenant Rios.  Upon Lieutenant Rios' arrival, Officer Charles advised him that "it was ok" and that the individuals "were locals that just came from fishing."  Officer Charles did not articulate any reasons for detaining Defendants any longer.  Thereafter, Officer Charles left the scene to search for illegal aliens allegedly dropped off at Robin Bay because he believed the tip did not pertain to the individuals in the pick-up truck.

In United States v. Brignoni-Ponce, 422 U.S. 873 (1975), the Supreme Court held that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion."  Id. at 881.  This holding was based on the importance of the governmental interest in stemming the flow of illegal aliens and on the minimal intrusion of a brief stop.  Royer, 460 U.S. at 510.  The court in Brignoni-Ponce noted the limited holding of Terry and, while authorizing the police to "question the driver and passengers about their citizenship and immigration status, and . . . ask them to explain suspicious circumstances," the court expressly stated that "any further detention or search must be based on consent or probable cause."  Brignoni-Ponce, 422 U.S. at 881-82; see also Royer, 460 U.S. at 500 (explaining that

10

any police confinement which goes beyond the limited restraint of a Terry investigatory stop may be constitutionally justified only by probable cause); Dunaway v. New York, 442 U.S. 200, 208-212 (1979) (discussing the narrow scope of Terry and its progeny).

Upon hearing that "it was ok" and that the occupants of the truck "were locals that just came from fishing," Lieutenant Rios was not justified in detaining Defendants any longer. Officer Charles did not Terry v. Ohio and the cases following it did not justify the restraint to which Defendants were then subjected because there was no longer any reasonable suspicion to believe that the occupants of the truck were illegal immigrants. However, Rios continued to detain Defendants, thus exceeding the scope of the Terry stop. Defendants were effectively seized for the purposes of the Fourth Amendment, as the circumstances amounted to a show of official authority such that "a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). In fact, Lieutenant Rios himself stated that Defendants were not free to leave at this point.

The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the initial detention were furthered by Rios's questions regarding what Defendants had caught fishing. Lieutenant Rios did not ask the occupants about their catch in an attempt to determine their immigration status. Furthermore, he had no reasonable, articulable suspicion to believe the nature of Defendants' fishing activities were illegal. See Terry, 392 U.S. at 30.

The confinement of Defendants in this case went beyond the limited restraint of a Terry investigative stop, and the search of the vehicle was thus tainted by the illegality.[1]  Royer, 460 U.S. at 501; see Brignoni-Ponce, 422 U.S. at 881-82; Adams v. Williams, 407 U.S. 143, 146 (1972).  At the time Lieutenant Rios found the baby lobsters and sea turtle, the detention to which Defendants were then subjected was a more serious intrusion on their personal liberty than is allowable on mere suspicion of illegal entry.  Lieutenant Rios violated Defendants' Fourth Amendment rights when he exceeded the purpose of the very limited investigatory detention, which was to determine whether Defendants' were illegal immigrants.  Therefore, all evidence obtained as a result of the detention and search is suppressed.

## IV. CONCLUSION

The Court finds that the detention of Defendants, subsequent to Officer Charles' investigatory stop, lacked reasonable suspicion or probable cause.  Therefore, the Court finds that Officer Rios' actions exceeded the permissible bounds of a Terry investigative stop.  For the reasons stated above, the Motion to Suppress is **GRANTED** as to all Defendants.

ENTERED this 10th day of October, 2008.

                                                         /s/
                                       **HONORABLE RAYMOND L. FINCH**
                                       **U.S. SENIOR DISTRICT JUDGE**

---

[1] Because Lieutenant Rios' detention of the occupants was not justified, the Court need not address the question of whether he had probable cause to search the pick-up truck.